UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
LAZARO BURT,

                Plaintiff,

        -against-

ROLANDO ALEMAN and MIGDALIA RODRIGUEZ,

                Defendants.
----------------------------------------------------------------x

**MEMORANDUM & ORDER**
05-CV-4493 (NGG)

NICHOLAS G. GARAUFIS, U.S. District Judge.

Plaintiff Lazaro Burt ("Plaintiff") brings this 42 U.S.C. § 1983 suit against Defendant Detective Migdalia Rodriguez ("Detective Rodriguez"), asserting a malicious prosecution claim and a due process claim based on alleged Brady violations.[1] (Amended Complaint (Docket Entry # 47) ¶¶ 54-59.) Detective Rodriguez has moved for summary judgment on both of Plaintiff's claims, arguing (1) that Plaintiff's claims must fail as a matter of law, and (2) that she is entitled to qualified immunity. For the following reasons, Detective Rodriguez's motion for summary judgment is GRANTED with respect to Plaintiff's malicious prosecution claim but DENIED with respect to Plaintiff's Brady claim.

I.     **STANDARD OF REVIEW**

"Summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-

---

[1] Plaintiff voluntarily withdrew his claims against Defendant Police Officer Rolando Aleman on July 10, 2006. (Docket Entry # 48.)

88 and Fed.R.Civ.P. 56(c)). Since Plaintiff is the nonmovant, the facts will be presented in the light most favorable to the Plaintiff. Factual disputes will be noted where relevant.

## II.   FACTUAL BACKGROUND

Late during the night of August 19, 1992, Wilfredo Cesario ("Cesario") was shot near the intersection of 105th Street and Northern Boulevard in Queens, New York. (Deposition of Lisette Saillant ("Saillant Dep."), excerpted in Declaration of Hillary A. Frommer ("F. Decl.") (Docket Entry # 73) Exh. B, Declaration of David Pressman ("P. Decl.") (Docket Entry # 82) Exh. 3, and Supplemental Declaration of Hillary A. Frommer ("F. Suppl. Decl.") (Docket Entry # 87) Exh. U, at 9; Medical Examiner's Report, F. Decl. Exh. A.) Lisette Saillant, Cesario's girlfriend, was standing three feet from Cesario's assailant at the time of the shooting. (Saillant Dep. at 9, 15). Cesario was taken to the hospital in an ambulance; Saillant followed in a police car with Police Officer Rolando Aleman ("Officer Aleman"). (Id. at 17.)

At the hospital, Saillant met two New York City police officers, Eddie Nadal and Detective Rodriguez, who took her to the 115th Precinct. (Id. at 17-18.) At the precinct, Saillant was questioned by the officers and looked through mug shots. (Id. at 18.) She identified Plaintiff as the man who shot Cesario. (Id. at 19-20.) There is a notation in Detective Rodriguez's memo book that suggests that Saillant may also have identified another individual as a possible suspect. (Deposition of Migdalia Rodriguez ("Rodriguez Dep."), excerpted in F. Decl. Exh. D, P. Decl. Exh. 4, and F. Suppl. Decl. Exh. T, at 66.)

Saillant has testified that she was under the influence of drugs the night of Cesario's shooting, but that she "quickly sobered after [he] got shot." (Saillant Dep. at 32.) According to Saillant, when she gave her statement to the detectives, "they asked me if I was, you know, if I

-2-

had used and I said, 'Yeah, I used.' " (Id. at 71.) Detective Rodriguez denies that she ever asked Saillant if she took drugs. (Id. at 95.) Although she conceded that Saillant seemed a "little disheveled" at the precinct, Detective Rodriguez stated that in all her interactions with Saillant, Saillant was always "sober and alert." (Rodriguez Dep. at 94-95.)

According to Saillant, she smoked crack at the precinct, because she "didn't want to feel," (Saillant Dep. at 76), but she has given contradictory testimony regarding whether she smoked crack before or after she looked through the mug shots, and whether or not she was high when she looked through the mug shots. She stated at her deposition that "that night at the precinct; I believe it's in my papers, I used. I had drugs on me; I used. I picked the picture and I was high. I was using." (Id. at 33.) Saillant also stated at her deposition, however, that she was sober when she looked through the mug shots: "Yes, I was sober." (Id. at 78.) When asked whether she smoked crack at the precinct before or after she looked through the mug shots, she stated: "After [the mug shots]. After or during. Maybe after or before the statement. I don't know." (Id. at 79.) When asked whether she had given her statement to the detectives before or after she looked through the mug shots, she stated:

> I don't remember. I can't — I can't tell you that. I just don't remember. Like this before and after thing, 14 years later, it's kind of hard and especially after I been through so much. I don't remember a lot of things. My memory is not that great. Like I still get flashbacks about that night but . . .

(Id.)

At approximately 3:00 A.M. on August 20, 1992, Officer Aleman reviewed an array of twelve photographs that included a photo of Plaintiff. Officer Aleman identified Plaintiff as "the guy I saw at 105th St. & Northern Boulevard 2 minutes before the shooting." (New York Police

-3-

Department ("NYPD") Informational Statement, F. Decl. Exh. G.)

On August 21, 1992, Plaintiff was arrested and brought to the 115th Precinct. (NYPD Informational Statement, F. Decl. Exh. H.) Saillant then returned to the precinct for a line-up. (Saillant Dep. at 20.) She was "nervous" and "traumatized." (Id. at 90.) Plaintiff chose to stand at position number five in the line-up. (Grand Jury Transcript, F. Decl. Exh. I, at 16.) Saillant identified Plaintiff as the shooter. (Saillant Dep. at 90-92.) When asked at her deposition whether she was high at the line-up, Saillant stated that she "might have been. I was using; I was on methadone." (Id. at 32-33.) Later in her deposition, however, Saillant twice stated that she was sober at the line-up. (Id. at 87, 108.)

Detective Rodriguez stated in an affidavit that an assistant district attorney from the Queens County District Attorney's Office was present during the line-up. (Affidavit of Migdalia Rodriguez, ("Rodriguez Aff.") F. Decl. Exh. K ¶ 5.) In her testimony before the Grand Jury that handed up Plaintiff's Indictment, however, Detective Rodriguez stated that "[p]resent at the line-up was my boss, Lieutenant Vazquez, and my coworker, Detective Nadal, myself, and Lisette Saillant." (Grand Jury Transcript, P. Decl. Exh. 9, at 8.) After the line-up was conducted, the District Attorney's Office authorized Detective Rodriguez to arrest Plaintiff for the murder of Cesario. (Rodriguez Aff. ¶ 7.) The District Attorney's Office also prepared a criminal court complaint against Plaintiff charging him with two counts of Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree. (Id. ¶ 9; Criminal Court Complaint ("Crim. Compl."), F. Decl. Exh. L.) Detective Rodriguez attested that, after the District Attorney's Office authorized Plaintiff's arrest, she was no longer involved in any decisions regarding the prosecution of Plaintiff, and she

-4-

did not encourage or press the District Attorney's Office "to present its case against Mr. Burt to the grand jury or seek an indictment against him." (Rodriguez Aff. ¶ 14.)

Saillant testified at her deposition that when she returned to her neighborhood after the line-up, "everyone attacked me like verbally. 'You picked the wrong guy.' They put a lot of doubt in my mind, and I was scared. I was even scared to go home." (Saillant Dep. at 21.) Two of Plaintiff's friends approached her, telling her that she had messed up and picked the wrong person. (Id. at 22-23.) Saillant also spoke with an unidentified woman, who told Saillant that she had not witnessed the crime, but who nevertheless told Saillant: "You are wrong. You are wrong." (Id. at 23.)

Beginning to doubt her identification of Plaintiff as the shooter, Saillant began to tell people — including her mother, her brother, and Cesario's parents — that she made a mistake in identifying Plaintiff. (Id. at 25, 27.) One or two days after the line-up, Saillant telephoned the 115th Precinct and spoke to Detective Rodriguez. (Id. at 25, 106.) Saillant's statements at her deposition relating to her telephone conversation with Detective Rodriguez are as follows:

> Q: And you spoke with Detective Rodriguez?
> Y: Yes.
> Q: And you claim that you told Rodriguez that you made a mistake?
> A: Yes.
> Q: What specifically did you say?
> A: I told her that I had been approached by some people in the neighborhood, and they — more than one person and that I was told I had picked the wrong person. . .
> Q: What else did you say, if anything?
> A: I don't remember. . .
> Q: What did she say back to you when you made that statement?
> A: Well, that I can remember there was enough evidence, he had already been picked out of a line up, I had picked him out of a mug shot and a line up.

(Id. at 108-09.)

After this telephone conversation, Saillant returned to the precinct to talk to Detective Rodriguez. (Id. at 20, 23.) Saillant told Detective Rodriguez, "I think I picked the wrong person. You should let this person go because — " (Id. at 24.) At another point during her deposition, Saillant stated that she went "back there hysterical, saying that I had made a mistake, and that I had picked the wrong guy." (Id. at 162.) According to Saillant, Detective Rodriguez told her "that there was enough — there was proof, whatever, you know, that if I was absolutely sure, and I was like I wasn't. I wasn't, at the time, actually. You know, I wasn't sure." (Id. at 24.) Detective Rodriguez didn't ask Saillant about the people who told her she had made a mistake. (Id. at 96.)

At her deposition, Saillant stated at one point that her phone call and meeting with Detective Rodriguez occurred after she testified at the grand jury:

> Q: This is before you testified at the grand jury, right?
> A: No, I don't think so.
> Q: You think it was after you testified at the grand jury?
> A: Might have been. I am not sure.

(Id. at 113.) However, Saillant later stated that she called Detective Rodriguez and went back to the precinct before testifying before the Grand Jury. (Id. at 116.) She later stated that there was "no doubt in her mind" that she went back to see Detective Rodriguez on the same day of the line-up (id. at 162), even though she had previously stated that she came to the precinct to talk to Detective Rodriguez one or two days after the line-up. (Id. at 25, 106.)

Saillant didn't contact Detective Rodriguez again after the telephone conversation and meeting because "they didn't want to listen to me. I remember they told me there was nothing they can do. Yes, that's what she said. There is nothing they could do because it was already

done. A done deal." (Id. at 113.)

Detective Rodriguez denies that Saillant ever contacted her to tell her that she had picked the wrong guy or used any words to that effect. (Rodriguez Dep. at 85.) Detective Rodriguez states that she never withheld any evidence or information from the District Attorney's Office. (Id. at 111.)

At the Grand Jury, Saillant testified that she saw Plaintiff shoot Cesario. (Saillant Dep. at 27-28.) The prosecutor asked the Grand Jurors to return an indictment against Burt for two counts of Murder in the Second Degree, one count of Criminal Possession of a Weapon in the Second Degree, and one count of Sexual Abuse in the Third Degree. (Grand Jury Transcript, F. Decl. Exh. M, at 17.) Plaintiff was indicted on all counts. (Indictment, F. Decl. Exh. M.)

After the Grand Jury, but before Plaintiff's trial, Saillant saw a man named Jarrett Smith on the street. Saillant claims that she then realized that Jarrett Smith was the shooter: "I recognized Jarrett Smith right away. That's when I knew then — then after having seen him that day, I could never forget his face." (Saillant Dep. at 144.) Saillant told Cesario's parents, her mother, and her brother about her encounter with Smith, but she was too scared to tell the police. (Id. at 144, 152.)

During Plaintiff's trial, Saillant was incarcerated at Rikers Island on an unrelated charge. (Id. at 28.) She stated that at one point during the trial:

> I said [to Detective Rodriguez and Eddie Nadal] 'You know, it's not the right guy.' And they totally like convinced me. They were like it has to be, and I just felt like really guilty, pressured. At the time, they just kept — they, I mean [Detective Rodriguez and Eddie Nadal] that there was enough proof.

(Id.) The detectives told her "[t]hat everything was said and done. You know, and I accused

[Plaintiff] because I wasn't sure. I wasn't sure. I wasn't sure at all." (Id. at 28-29.)

Notwithstanding her doubts, Saillant testified at Plaintiff's trial that there was no doubt in her mind that Plaintiff shot Cesario. (Trial Transcript ("Trial Tr."), F. Decl. Exh. O[2], at 281.)

Officer Aleman testified at Plaintiff's trial that late during the night of August 19, 1992, when he was driving with his partner on patrol, he saw Plaintiff at 105th Street and Northern Boulevard with what appeared to be a gun under his jacket. (Id. at 195-96.) Officer Aleman testified that approximately one or two minutes later, he heard a report on his police radio that a man had been shot on that corner. (Id. at 197.)

Plaintiff was convicted by the jury of Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Sexual Abuse in the Third Degree. (Sentencing Transcript, F. Decl. Exh. R, at 20.) He was sentenced to concurrent sentences of twenty-five years to life for the murder count, seven-and-a-half to fifteen years for the possession count, and three months for the sexual abuse count. (Id. at 21-22.)

On September 26, 2002, Saillant testified at a hearing in New York State Supreme Court held upon Plaintiff's motion to vacate his judgment. She testified that Smith, not Plaintiff, shot Cesario. (Article 440 Hearing Transcript, P. Decl. Exh. 6, at 19.) Carl Drummond, an eyewitness to the shooting who could not be located at the time of Plaintiff's trial, also testified that Burt had not shot Cesario. (Id. at 36; Affidavit of Elise S. Zealand, Esq., F. Decl. Exh. P, ¶¶ 25-26.) At the hearing, Plaintiff's conviction was vacated, and he was ordered released from state custody. (Id. at 39.)

---

[2] Parts of Exhibit O were provided to the court on April 14, 2008. (See Docket Entry # 88.)

## III. PLAINTIFF'S MALICIOUS PROSECUTION CLAIM

"To prevail on a claim of malicious prosecution, four elements must be shown: (1) the defendant initiated a prosecution against plaintiff; (2) without probable cause; (3) the proceeding was begun with malice and; (4) the matter terminated in plaintiff's favor." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997).

A police officer who swears to and signs a criminal court complaint, as did Detective Rodriguez, (see Crim. Compl.), has "initiated" a prosecution. Cox v. County of Suffolk, 827 F. Supp. 935, 938 (E.D.N.Y. 1993). At the time that Detective Rodriguez swore to and signed the criminal court complaint, Saillant had not yet expressed any doubts to Detective Rodriguez regarding her identification of Plaintiff. See supra text at 4. At that time, therefore, Detective Rodriguez had probable cause to believe that Plaintiff shot Cesario, based on Saillant's eyewitness identification of Plaintiff. See Carson v. Lewis, 35 F. Supp. 2d 250, 260 (E.D.N.Y. 1999) (eyewitness identification of suspect generally gives rise to probable cause). Detective Rodriguez's signing of the criminal court complaint thus does not render her liable for malicious prosecution.

Detective Rodriguez might still be liable for malicious prosecution, however, under a theory that she maliciously "continued" the prosecution of Plaintiff after she learned that there was no longer probable cause to believe that Plaintiff had committed a crime. See Kinzer v. Jackson, 316 F.3d 139, 143-44 (2d Cir. 2003) (malicious prosecution action can succeed if probable cause, while initially present, is later no longer present). After Plaintiff's arrest, however, control of his prosecution passed into the hands of the District Attorney's Office. Once control of a prosecution has passed to a prosecuting attorney, a police officer may only be liable

for "continuing" the prosecution if he or she "[insists] upon or [urges] further prosecution." Dirienzo v. United States, 690 F. Supp. 1149, 1158 (D. Conn. 1988), citing Restatement (2d) Torts, § 655, comment c (1977) (control of prosecution passed from FBI agents to United States Attorney after plaintiff was arrested); see also Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994) (finding, citing Dirienzo, that control of prosecution passed from federal agents to prosecutor after grand jury indicted plaintiff; federal agents could therefore no longer be held liable for malicious prosecution); Jenkins v. City of New York, No. 98-CV-7170 (JGK) (DFE), 1999 WL 782509, at *11 n.3 (S.D.N.Y. Sep. 30, 1999), aff'd, 216 F.3d 1072 (2d Cir. 2000) (unpublished).[3]

The record is bereft of any evidence showing that Detective Rodriguez insisted upon or urged further prosecution of Plaintiff after his arrest.[4] Therefore, even if the information that

---

[3] In Kinzer, 316 F.3d at 144, the Second Circuit declined to "analyze New York law on an officer's obligation in 1999 (or now) to convey exculpatory information to the prosecution after criminal proceedings have commenced and the prosecutor has taken control over the case," because it found that the defendant officer had in fact timely delivered exculpatory information to the prosecution.

[4] In Detective Rodriguez's affidavit, she states that the District Attorney's Office prepared the criminal court complaint against Plaintiff and that, after the District Attorney's Office authorized the arrest of Plaintiff, she had no further involvement in decisions regarding the prosecution of Plaintiff. She also states that she did not "suggest, encourage, or press the District Attorney's Office to present its case against Mr. Burt to the grand jury or to seek an indictment against him." (Rodriguez Aff. ¶¶ 9, 12, 14.) Although Plaintiff points to inconsistencies in Detective Rodriguez's statements regarding who was present at the line-up in which Saillant identified Plaintiff as the shooter, see supra text at 4, he does not present any evidence to show that the District Attorney's Office did not authorize his arrest or draft the criminal court complaint against him, or that Detective Rodriguez played any role in his prosecution after the line-up beyond testifying before the Grand Jury that handed up his indictment. Inconsistencies in Detective Rodriguez's statements regarding who was present at the line-up do not create a genuine issue of material fact with respect to whether Detective Rodriguez was actively involved in his prosecution after the line-up, because she has specifically controverted such involvement in her affidavit and Plaintiff has presented no evidence to the contrary.

later came into Detective Rodriguez's hands completely exculpated Plaintiff, Detective Rodriguez would not be liable for malicious prosecution because of her failure to disseminate this information. See Dirienzo, 690 F. Supp. at 1158 ("Even if the information had completely exculpated plaintiff, however, plaintiff could not prevail on his claim of malicious continuation of the prosecution.")

Plaintiff claims that Detective Rodriguez's testimony before the Grand Jury, in which she stated that Plaintiff was standing at the number five position in the line-up, was deceptive, in that Detective Rodriguez then knew that Saillant was no longer sure that Plaintiff shot Cesario. Plaintiff argues that this deception constitutes an active role sufficient to render Detective Rodriguez liable for malicious continuation of the prosecution.

Truthful, although potentially deceptive, testimony by a police officer before a Grand Jury, however, does not amount to "insisting upon or urging further prosecution," the activity which under Dirienzo can cause a police officer to be held liable for malicious prosecution after control of the prosecution has passed to a prosecuting attorney. The cases cited by Plaintiff do not suggest otherwise.[5] Detective Rodriguez is therefore entitled to summary judgment on Plaintiff's claim of malicious prosecution.

---

[5] The cases cited by Plaintiff involve law enforcement officials who fabricated evidence or misled prosecutors so as to influence the prosecutor's *initial* decision to prosecute. See Chimurenga v. City of New York, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) (officers allegedly planted razor blade on plaintiff, influencing prosecutor's decision to prosecute); Noga v. City of Schenectady Police Officers, 169 F. Supp. 2d 83 (N.D.N.Y. 2001) (officer engineered arrest and prosecution of his friend's landlord for engaging in self-help by instigating the filing of a complaint and failing to inform prosecutor or fellow officer that landlord had self-help rights under lease); Ramos v. City of New York, 729 N.Y.S.2d 678, 690-91 (1st Dep't 2001) (report omitting exculpatory information was sent to prosecutors before prosecution commenced).

In any case, public officials, like Detective Rodriguez, "are entitled to qualified immunity from liability for civil damages so long as their conduct does not violate a clearly established statutory or constitutional right. Public officials receive this protection upon establishing that it was objectively reasonable for them to believe that their acts did not violate clearly established rights." Selsky, 5 F.3d at 621 (internal citations omitted). Because the case law in 1992 did not clearly establish that truthful, albeit potentially deceptive, testimony by a police officer before a Grand Jury could give rise to liability for malicious prosecution, Detective Rodriguez is entitled to qualified immunity on Plaintiff's malicious prosecution claim. See Rohman v. New York City Transit Auth., 215 F.3d 208, 217 (2d Cir. 2000) ("Under the circumstances, it was objectively reasonable for Bianco to believe that he came within the safe harbor for the 'mere reporting' of suspected crime. That objectively reasonable belief entitles him to protection under the doctrine of qualified immunity.")

II.   Plaintiff's Brady Claim

Plaintiff contends that Detective Rodriguez violated his rights under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose to his prosecutors that Saillant had recanted her identification of Plaintiff as the shooter.

In order to show a Brady violation, a party must show that exculpatory or impeachment evidence favorable to that party was suppressed by the prosecution, either willfully or inadvertently,[6] and that there is a reasonable probability that the suppressed evidence, had it been

---

[6] At least one circuit court has found that negligence by a law enforcement officer in failing to disclose Brady material is insufficient to trigger liability under 42 U.S.C. § 1983. See Porter v. White, 483 F.3d 1294, 1307 (11th Cir. 2007). As Detective Rodriguez denies that the alleged conversations with Saillant ever occurred, she does not argue that she only acted

presented at trial, would have produced a different verdict. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Under Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992), police officers, as well as prosecutors, have disclosure obligations under Brady.[7] However, because "the defendant's appropriate point of contact with the government during litigation is the prosecutor," police officers may satisfy their Brady obligations by turning over evidence to the prosecutor. Id. They need not turn over evidence to the defendant. This is partly because "[i]t is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes Brady material that must be disclosed to the defense." Id.

Detective Rodriguez's strongest argument for dismissal of Plaintiff's Brady claim is that evidence of Saillant's recantation was not exculpatory or impeachment evidence, because all Saillant allegedly told Detective Rodriguez was that people in her neighborhood told her she made a mistake when she identified Plaintiff as the shooter. (Def. Mem. at 26.) The court agrees that if this were the substance of all three of Saillant's statements, Plaintiff's Brady claim would likely need to be dismissed. This is because evidence that unnamed people in Saillant's neighborhood thought Saillant made a mistake has so little evidentiary reliability that it is not material exculpatory evidence required to be disclosed to the criminal defendant. See Buie v.

---

negligently. In any case, the evidence in the record shows that there is a genuine issue of material fact for trial with respect to whether Detective Rodriguez acted intentionally when she allegedly failed to disclose Saillant's statements to the prosecution.

[7] Because Walker was decided before Plaintiff's trial, the court rejects Detective Rodriguez's argument that she is entitled to qualified immunity on Plaintiff's Brady claim because "in 1992 the Brady obligation rested with the prosecution, not the police officers." (Def. Mem. at 28).

Phillips, No. 03-CV-7965 (RMB), 2006 WL 2291013, at *2 (S.D.N.Y. Aug. 3, 2006) (unreliable evidence not considered material).

The first time that Saillant spoke to Detective Rodriguez, she allegedly told Detective Rodriguez only that people in her neighborhood told her she had mistakenly identified Plaintiff as the shooter. The second and third times that Saillant spoke to Detective Rodriguez, however, she allegedly stated that "I think I picked the wrong person" and "You know, it's not the right guy." See supra text at 5-7. It is possible that a jury might find that these later statements, if actually made,[8] were merely repetitious of Saillant's initial statements that other people thought Plaintiff was not the shooter. These statements would therefore not have been exculpatory or impeachment evidence subject to disclosure under Brady. However, it is also possible that a jury might find that Saillant actually was telling Detective Rodriguez that she herself did not think Plaintiff shot Cesario.[9] In this case, Saillant's statements would have been important impeachment evidence for Plaintiff to use to undermine the jury's confidence in the reliability of Saillant's identification of him as the shooter. Plaintiff has therefore demonstrated that there is a

---

[8] The court acknowledges that Saillant's version of the events may not seem wholly credible. For example, her deposition testimony that she insisted to Detective Rodriguez during Plaintiff's trial that Plaintiff was not the "right guy" is difficult to square with her recorded testimony at trial that she had "no doubt" that Plaintiff shot Cesario. Nevertheless, because it is the function of the jury, not the court, to make credibility determinations, the court is precluded from granting summary judgment on this basis. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

[9] The court notes that Saillant's recollection of Detective Rodriguez's response supports this latter conclusion: Detective Rodriguez told her "that there was enough — there was proof, whatever, you know, that if I was absolutely sure, and I was like I wasn't." See supra text at 6. Detective Rodriguez likely would not have responded in this way to Saillant if Saillant had merely told her again that she was unsure of her identification of Plaintiff because of what people in her neighborhood told her.

genuine issue of material fact for trial with respect to whether Saillant's statements to Detective Rodriguez were impeachment or exculpatory evidence subject to disclosure under Brady.

Detective Rodriguez also argues that, even assuming that Saillant's statements to her constituted impeachment evidence favorable to the Plaintiff, Plaintiff's Brady rights were not violated because there is not a reasonable probability that, had the evidence she allegedly withheld been available to Plaintiff at trial, the verdict at trial would have been different. Specifically, Detective Rodriguez argues that Saillant's credibility was exhaustively questioned at trial and that the evidence that she allegedly withheld was merely cumulative impeachment evidence that would not have affected the verdict. (Def. Mem. at 26.)

At Plaintiff's trial, Saillant was questioned about her drug addiction, about a burglary and shoplifting incident that occurred after Cesario was shot, and about her 1989 guilty plea to facilitating a sale of drugs. (Trial Tr. at 317-18, 320-24.) Saillant also read aloud an excerpt from a cooperation agreement she had signed that stated that the Queens District Attorney's Office would "recommend to the Court that [Saillant] receive a non-incarceration sentence . . . in return for her plea of guilty, and in return for her complete and truthful testimony in the upcoming trial and investigation of defendant Lazaro Burt and, if necessary, Mark Angel. In addition, this plea will cover the misdemeanor cases now pending in Criminal Court." (Id. at 333-34.) The jury heard evidence that, in exchange for this recommendation of a non-incarceration sentence, Saillant pleaded guilty to a burglary and to two misdemeanor offenses. (Id. at 334-35.)

The court disagrees that evidence of Saillant's doubts about her identification of Plaintiff was duplicative of the impeachment evidence presented at Plaintiff's trial. Saillant's doubts go

-15-

to the heart of the State's case against Plaintiff: the reliability of Saillant's identification of Plaintiff as the shooter. Evidence of Saillant's doubts would have been significantly stronger proof of the lack of reliability of Saillant's identification of Plaintiff than defense counsel's efforts to imply that Saillant was motivated by her cooperation agreement with the District Attorney's Office to lie to the jury about who shot her boyfriend. Because this impeachment evidence is of a completely different nature from the other impeachment evidence presented by Plaintiff at his trial, it is not merely cumulative of that other evidence. Cf. United States v. Orena, 145 F.3d 551 (2d Cir. 1998) (finding impeachment evidence cumulative where jury learned at trial of numerous murders committed by government's witness and where inference from newly discovered evidence that witness had previously lied about defendants was weak). In light of the paucity of other evidence presented against Plaintiff at trial — namely, Officer Aleman's testimony that he had seen Plaintiff near the scene of the crime with what appeared to be a gun under his jacket — there is therefore a genuine issue of material fact with respect to whether there is a reasonable probability that evidence of Saillant's alleged statements, had it been presented at trial, might have produced a different verdict.

Finally, Detective Rodriguez points out that Saillant was in communication with the District Attorney's Office before trial. (Def. Mem. at 26.) Detective Rodriguez argues that she therefore had no duty to disclose to the prosecution the alleged statements Saillant made to her because she reasonably could have assumed that the assistant district attorney assigned to the case already knew about Saillant's doubts regarding her identification of Plaintiff. (Id. at 25.)

In Kelly v. Curtis, 21 F.3d 1544 (11th Cir. 1994), a police detective was sued for failing to disclose a laboratory report exculpating the criminal defendant to the assistant district attorney.

The report stated on its face that the assistant district attorney would be receiving a copy of the report. The Eleventh Circuit found that there was no case law "clearly establishing a federal statutory or constitutional duty on the part of a law enforcement officer to inform the prosecutor's office of exculpatory evidence that the officer has reason to believe is already known to that office." Id. at 1552.

Here, however, Detective Rodriguez could not reasonably have thought that the District Attorney's Office knew of the statements Saillant allegedly made to her, because no assistant district attorney was present when Saillant made the alleged statements. Detective Rodriguez's belief that Saillant would make similar statements to an assistant district attorney or to defense counsel is purely speculative and insufficient to discharge her of her duty to share this evidence with the assistant district attorney, who had the responsibility to make the final legal determination of what constituted Brady material. See Walker, 974 F.2d at 299.

In any case, even if Saillant had also expressed her doubts to an assistant district attorney, Saillant's statements to Detective Rodriguez regarding her doubts might still have been Brady material, as they would have further demonstrated the unreliability of Saillant's identification of Plaintiff as the shooter. This is therefore not a case like Kelly, in which there was only one piece of evidence, a laboratory report, at issue. Here, each statement made by Saillant would have been a useful piece of impeachment evidence for the defense, which the prosecutor would have needed to know about in order to fulfill the State's obligations under Brady.

Because Plaintiff has presented sufficient evidence for a reasonable jury to conclude that Detective Rodriguez violated his rights under Brady, Detective Rodriguez is not entitled to summary judgment on Plaintiff's Brady claim.

## V. CONCLUSION

For the reasons stated above, Detective Rodriguez's motion for summary judgment is GRANTED with respect to Plaintiff's malicious prosecution claim, but DENIED with respect to Plaintiff's Brady claim.

SO ORDERED.

Dated: April 29, 2008
Brooklyn, N.Y.

/signed/
NICHOLAS G. GARAUFIS
United States District Judge